# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CATHERINE CABRERA,<br><br>Defendant. | CASE NO. 11cr4518 - IEG<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS**<br><br>[Doc. No. 21]<br><br>**(2) GRANTING IN PART DENYING IN PART DEFENDANT'S MOTION IN LIMINE TO ADMIT EXCULPATORY STATEMENTS**<br><br>[Doc. No. 23] |

Presently before the Court is Defendant Catherine Cabrera's motion to suppress and her motion in limine to admit exculpatory statements. [Doc. Nos. 21, 23.] For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** both motions.

## BACKGROUND

**I.     Vehicle Inspection and Arrest**[1]

On September 7, 2011 at approximately 10:55 a.m., Defendant attempted to enter the United States through the San Ysidro Port of Entry as the driver and sole occupant of a white,

---

[1] The statement of facts underlying Defendant's arrest is taken from the parties' briefs on Defendant's motion to suppress. Because these facts are not disputed for purposes of this motion, neither party has provided the Court with underlying evidence establishing these facts.

2006 Honda Civic. Defendant informed the primary officer on duty that she was headed home to Whittier, California, had purchased the car a week earlier, and had nothing to declare. Upon query of the vehicle's VIN number, the primary officer received a computer generated referral on the vehicle and requested the assistance of a canine enforcement officer. The canine officer then ran his dog on the vehicle, and the dog alerted to the dashboard area of the car.

The officers referred the vehicle to secondary for further inspection. Once in secondary, an officer opened the hood of the car and observed some packages in the firewall area. The officers then drove the vehicle through an x-ray machine and saw anomalies in the firewall area. Thereafter, officers removed 11 packages of a substance that field-tested positive for cocaine from the car. The packages had a total weight of approximately 9.5 kilograms or 20.9 pounds. At around 1:00 p.m., officers informed Defendant of their discovery and placed her under arrest.

## II.     Defendant's Interrogation

Defendant's interrogation began at approximately 5:00 p.m., and lasted approximately three hours and forty-five minutes. [See generally Doc. Nos. 21-2, 21-3, 21-4, 21-5.][2] The interrogation was conducted primarily by Department of Homeland Security Agents Patrick MacKenzie and Javier Enriquez in English. [Id.] Defendant is fluent in English and states in her motion that the fact the interrogation was conducted in English is not at issue in her motion. [Doc. No. 21-1 at 2.]

The agents began the interrogation by obtaining background information from Defendant. [Doc. No. 21-3 at 1-10.] Agent MacKenzie then informed Defendant of her Miranda rights one by one. [Id. at 10-11.] Defendant stated that she understood each right, and initialed that she understood the rights on the waiver form. [Id.] Agent MacKenzie explained to Defendant that if she wished to speak with them, she would have to sign the waiver form acknowledging she understood her rights and that she waived them freely and voluntarily without threat or

---

[2] When citing to the interrogation, the Court will refer to the transcripts of the interrogation DVDs attached to Defendant's motion to suppress. The Court has also viewed the actual DVDs of the interrogation that the Government provided along with its response in opposition to Defendant's motion. [Doc. No. 27.] However, there were no timestamps on the DVDs. Therefore, the Court is unable to cite to the DVDs themselves. Any citation to the transcripts should also be considered a citation to that section of the DVDs.

intimidation and without any promise of reward or immunity.  [Id. at 11.]

Defendant began to tell the agents that she was not involved with the narcotics and did not know about them.  [Doc. No. 21-2 at 11.]  Agent MacKenzie explained to Defendant again that if she wanted to speak to them about what happened, she would have to sign the waiver, and that she could stop the interrogation at any time for the purpose of consulting with an attorney.  [Id. at 12.]  The agent also told Defendant that she would eventually be provided with an attorney even if she agreed to waive her Miranda rights.  [Id. at 13.]  Agent MacKenzie then explained to Defendant she was under arrest and charged with two federal felonies and that she would be taken to the federal jail whether or not she spoke with them.  [Id.]

Defendant again tried to explain her story to the agents.  [Doc. No. 21-2 at 14.]  Agent MacKenzie again told her that they could not talk to her about her background story and stated the following:

> Agent MacKenzie: So I don't mean to be rude or disrespectful.  I mean you know we're kind of at that point where its either you gotta you gotta waive your rights.  If you're uncomfortable with the way this is going . . .
>
> Defendant: Um hum.
>
> Agent MacKenzie: And you don't want to do it anymore just say hey guys I think now is the time to call a time out and I don't want to do this anymore.  And then its over you know, then we're done.  Its your decision.  And we don't want to you know have any influence over that.

[Id.]  Defendant still stated that she was not sure.  [Id. at 14-15.]  The agents tried to explain the process to Defendant.  They told her she would go to jail no matter what, and then she would be taken before a judge and given an attorney.  [Id. at 15.]  The agents explained that they would make a report based on any statements Defendant made during the interview, and that the report would be provided to the U.S. Attorney and Defendant's attorney.  [Id.]  But if Defendant did not tell them anything, then they would not provide the attorneys with a report.  [Id. at 15-16.]  The agents also explained that Defendant might not get an attorney that day, but that she would be provided one before she appeared before a judge.  [Id. at 16.]

Defendant stated that she was still not sure.  [Id. at 17.]  She said that she wanted to tell the agents her story, but she did not want to sign the waiver form and have it hurt her later.  [Id.]  The agents said that it was her decision, that she did not have to sign the waiver, and that they would

- 3 - 11cr4518

respect her decision. [Id. at 17-18.] The agents then gave Defendant a more thorough explanation of her Miranda rights, and Defendant read through the waiver form again. [Id. at 18-20.] Defendant stated that she was worried about statements coming back to hurt her later, and the agents stated that they could not guarantee that her statements would not be used against her later. [Id. at 20.] The agents informed Defendant of her rights a third time. [Id. at 20-21.] Defendant read the waiver aloud, acknowledged that she understood her rights, and signed the waiver form. [Id. at 21.]

Defendant's interrogation was conducted in three phases. The first phase lasted about three hours including the portions where the agents obtained her background information and her Miranda waiver. During the first phase, Defendant began to tell the agents her story, but she made several inconsistent statements. Agents MacKenzie and Enriquez stated that they did not believe her story, and told her that the U.S. attorney would not believe her story, and that they would like her to be honest with them. [See, e.g., Doc. No. 21-2 at 47; Doc. No. 21-3 at 51, 67-68.] In addition, Agent MacKenzie stated a couple times that although he could not make any promises, things generally go better for people that tell the truth and the agents would tell the U.S. Attorney if they thought she was being honest with them. [Doc. No. 21-3 at 55-56, 89.] Agent MacKenzie also told Defendant that he could not promise anything, but he assumed that because her story had so many holes in it, the U.S. Attorney would go "full tilt" and seek the maximum penalty for her. [Doc. No. 21-3 at 63.] Later in the interview, the agents looked through Defendant's cell phone, and the agents told Defendant:

> Agent Enriquez: You know from the brief look I had at those messages. I think you do know this guy. Not only do you know him, but you are involved with this guy. Okay? Once we get the time of those messages in better detail, we're going to get a better picture.
>
> Agent MacKenzie: But that means that might have to come out in court, you know, maybe he is somehow involved. Because we have to cover all the angles on this, you know, that's just the way it works, um. You might want to have a little talk with your husband before I have to do that just in case.

[Id. at 90; see also id. at 87.]

Throughout this initial interview, Defendant told the officers that she was being honest but then changed some parts of her story. Her story continued to contain noticeable inconsistencies.

However, even after changing her story, Defendant continued to maintain that she did not know there were drugs in her car. [See, e.g., Doc. No. 21-3 at 56, 67, 73.] Eventually, the agents said that they were frustrated, and Agent MacKenzie stated a few times that he would end the interview because he thought he was being lied to, but Defendant appeared to want to continue the interrogation. [See, e.g., id. at 63-64, 100-01.] During this phase, the agents remained calm, were sitting at a table with Defendant, and never raised their voices at her.

After about three hours, agent Michael Bettencourt entered the room. Agent Bettencourt appeared to be agitated and began speaking to Defendant forcefully, yelling at times, interrupting her, and pacing around the room. Agent Bettencourt told Defendant that an innocent person would not be as calm as she was acting and would instead be freaking out. [Doc. No. 21-3 at 91.] He then said:

> Agent Bettencourt: What's the mandatory . . .
>
> Agent MacKenzie: 10 years.
>
> Agent Bettencourt: for mandatory minimum? How old are your children?
>
> Defendant: 17 and 19.
>
> Agent Bettencourt: So 27 and 29 think about that.
>
> Defendant: I'm really, I don't know what else to do I . . .
>
> Agent Bettencourt: Tell the truth, that's what you can do.
>
> . . .
>
> Agent Bettencourt: You're very sharp and you are very manipulative. Extremely, you are very sharp, and you are intelligent, and you are very articulate, but you are extremely manipulative the way you turn your story and stay very calm and collected. Oh this is what, this is, oh, this is. And its sociopathic. Actually, its very interesting. I love psychology and you are . . .
>
> Defendant: No I . . .
>
> Agent Bettencourt: the cream of the crop.

[Id. at 91-92.] Shortly after, Agent MacKenzie again told Defendant that the mandatory minimum is ten years, and that he would tell the U.S. Attorney that he did not believe her story and he would prove to the attorney that her story is a lie. [Id. at 93.] Agent Bettencourt then made several sarcastic comments to Defendant such as: "Oh yeah, cause $200,000 worth of coke. . . . The drug

fairy's going to go pick it up and magically like secrete it from your vehicle without you knowing." [Id. at 95.] He also said: "Oh you're an alien smuggler . . . and you worked yourself up to dope. That's it there you go." [Id. at 99.] Agent MacKenzie also at one point told Defendant: "We're either going to trial or your attorney's going to talk to you and he's going to say hey you know what, tell them the truth, there's more to the story." [Id. at 96.] Agent Bettencourt and Agent MacKenzie then continued to tell Defendant that her story had holes, they did not believe her story, and they would tell that to the U.S. Attorney. [See id. at 94-100.] Defendant did not change her story, and the agents then ended the interview. [Id. at 101.]

The interrogation began again some time later with San Diego Police Officer Miguel Morales now interrogating Defendant. Officer Morales was seated and did not raise his voice, but he did speak assertively. He interrupted Defendant before she completed almost every sentence and would at times put words in her mouth. He told Defendant:

> Officer Morales: This is the only opportunity you have to help yourself. And that's the only reason I'm telling you. Cause you can either tell him the truth, the whole truth, or just stick to what you've got so far and what you have done right now. Instead of helping you, its going to hurt you because they're going to think of you as both a smuggler and a liar. Okay, as opposed to just a smuggler that's doing it because they're having a hard time making ends meet. Maybe because their house is foreclosed, because their kids need shoes, they need food, they need whatever they need. Okay. And what you did was because you're a good mother. That's why you did it, right? Because you're a good mother and you want to provide for your kids. That's admirable. Its just a bad decision.

[Doc. No. 21-4 at 2.] Officer Morales later said: "Do you understand not being there for your daughter's wedding. How do you think she's going to feel that day? How do you think she's going to feel? Think about it." [Id. at 3.] Defendant appeared to get upset shortly after Officer Morales made these statements. Officer Morales then repeatedly told Defendant to tell him the truth and stop lying. [See, e.g., id. at 4, 6.] Eventually, Defendant admitted to Officer Morales that she did know there were drugs in her car. [Id. at 6.] Officer Morales continued to interrogate Defendant about where she was going to take the drugs once she crossed the border and her compensation for transporting the drugs. At one point Officer Morales said:

> Officer Morales: Because if you, if you cooperate and give em the story. Once again, the judge is going to look at the paper and he's going to see one of two things. He's either going to say look at the story and read it and then he's going to first laugh and after he's done laughing he says okay, obviously she did not learn, she must be part of the group, she's involved. Uh, she's giving a false story

| | |
|---|---|
| 1 | because she is protecting someone, that she is a player. |
| 2 | Defendant: I'm not protecting nobody. |
| 3 | Officer Morales: You were protecting. Well, I'm just telling you what the judge is going to think, okay. Or because they'll look at it another way when you tell the truth finally tell the truth. Okay? Trust me if you have four guys telling you that its not true, its because it is that obvious. . . . Now if you're honest with us and you tell us exactly what happened and they look at that and the judge looks at that and the attorney looks at that and say, hey, you you know what, yeah, hard times, everybody, we're all going through hard times. She's going through a hard time, she had no other options, she made a bad decision. |

[Id. at 12-13.] Defendant then admitted that she would be compensated for transporting the drugs across the border. [Id. at 15-18.] This second interview took about 20 minutes.

The interrogation began for a third time with Agent MacKenzie back interrogating Defendant. Agent MacKenzie told Defendant that it sounded like she had started to tell the truth, and Defendant responded: "Well I think I'm admitting that I knew that they were going to put the drugs in the car." [Doc. No. 21-5 at 1.] Agent MacKenzie then began taking down her confession in more detail. At one point, Agent McKenzie asked Defendant:

> Agent MacKenzie: Now you have been sitting in here a long time and I want to make it pretty clear that we understand each other. Under no time have we you know . . .
>
> Defendant: Pressured me to say anything?
>
> Agent MacKenzie: You agree with that statement?
>
> Defendant: Yes. Yes. I understand.
>
> Agent MacKenzie: Okay, um, you know because there's you know there's different ways to interview somebody and you know basically, you finally decided you were going to tell the truth. Isn't that correct.
>
> Defendant: Yes
>
> Agent MacKenzie: Okay. Um, so we didn't shut the door and give you a couple of punches or anything like that right. Your, you just basically decided it was time to tell the truth. Okay. Just wanted to make sure. Because I wasn't here the whole time, and I want to make sure you know that you know that.
>
> Defendant: Oh no, the other agent made me realize a lot of stuff.

[Id. at 2-3.] This third interview concluded after about 15 minutes.

///

///

# DISCUSSION

**I.   Defendant's Motion to Suppress**

Defendant moves to suppress the statements she made during her interrogation because her confession was not voluntary. [Doc. No. 21-1 at 7-9.] Defendant argues that her will was overborne by the psychological and emotional pressure placed on her by the agents. [Id.] In response, the Government argues that Defendant validly waived her Miranda rights, and the agents did not coerce Defendant's statements. [Doc. No. 27 at 5-13.]

<u>A.</u>   <u>Waiver of Miranda Rights</u>

As an initial matter, the Government argues that Defendant validly waived her Miranda rights. [Doc. No. 27 at 5-10.] Defendant does not contest that she waived her Miranda rights. Defendant appears to only argue that her statements were coerced. [Doc. No. 21-1 at 7-9.]

"For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's 'waiver of Miranda rights must be voluntary, knowing, and intelligent.'" United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998). A valid waiver of Miranda rights depends upon the "'totality of the circumstances including the background, experience, and conduct of defendant.'" Id. (quoting United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986). After reviewing the totality of the circumstances, the Court finds Defendant validly waived her Miranda rights.

<u>B.</u>   <u>Voluntariness of Statements</u>

Defendant argues that even if she waived her Miranda rights, her statements should be suppressed because they were not voluntary and were coerced. [Doc. No. 21-1 at 7-9.] In response, the Government argues that the agents did not engage in any coercive conduct during the interrogation. [Doc. No. 27 at 10-12.] Specifically, the Government argues that the agents did not yell at or threaten Defendant and the agents never made her any promises in order to overcome her will. [Id. at 12.] In addition, the Government argues that even if some of the agents' statements went too far, these statements did not cause Plaintiff to confess.

"Involuntary or coerced confessions are inadmissible at trial because their admission is a violation of a defendant's right to due process under the Fourteenth Amendment." Brown v.

Horell, 644 F.3d 969, 979 (9th Cir. 2011) (citations omitted).  A confession is involuntary if it is not "'the product of a rational intellect and a free will.'"  Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)).  "Whether a confession is involuntary must be analyzed within the 'totality of the circumstances.'"  Brown, 644 F.3d at 979 (quoting Withrow v. Williams, 507 U.S. 680, 693 (1993)).  "The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age."  Id.; see also Pollard, 290 F.3d at 1033.  "The government must prove that a confession is voluntary by a preponderance of the evidence."  United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

A "necessary predicate" to finding a confession involuntary is that it was produced through "coercive police activity."  Brown, 644 F.3d at 979 (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)); Pollard v. Galaza, 290 F.3d 1030, 1033 (9th Cir. 2002) (explaining that "'coercive conduct by police must have caused [the defendant] to make the statements'").  Coercive police activity can be the result of either "physical intimidation or psychological pressure."  Townsend, 372 U.S. at 307.  In United States v. Tingle, the Ninth Circuit found the agent's conduct to be "patently coercive" when the agent warned that "a lengthy prison term could be imposed, that [defendant] had a lot at stake, that her cooperation would be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that she might not see her two-year-old child for a while."  658 F.2d at 1336 (footnotes omitted).  Further, the Ninth Circuit has explained that threats and promises relating to one's children carry special force.  Brown, 644 F.3d at 980.  "The relationship between parent and child embodies a primordial and fundamental value of our society."  Tingle, 658 F.2d at 1336.  When interrogators "deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert the 'improper influence' proscribed by [the Supreme Court in Malloy v. Hogan, 378 U.S. 1, 8 (1964)]."  Id.

The Court first finds that the agents clearly engaged in coercive tactics.  The agents told Defendant that a lengthy prison sentence would be imposed, a 10 year mandatory minimum

sentence,[3] and at one point, Agent MacKenzie told Defendant that if she did not tell the truth, the U.S. Attorney would go "full tilt" and seek the maximum penalty. The agents said that if Defendant cooperated, her cooperation would be communicated to the prosecutor and the judge, and the agents implied that things would go better if she did cooperate.[4] The agents also repeatedly told Defendant that if she continued lying, that also would be communicated to the prosecutor. Also, Agent MacKenzie at one point told Defendant that her own attorney would instruct her to tell the truth.[5] The agents also told Defendant that she would not see her children for a long time. After telling Defendant that the mandatory minimum sentence was 10 years, Agent Bettencourt told Defendant that she would not see her children until that were 27 and 29 years old. Officer Morales also told Defendant to think about what it would be like to not be present at her daughter's wedding. These two comments were clearly meant to prey on Defendant's maternal instincts. See, e.g., Brown, 644 F.3d at 980; Tingle, 658 F.2d at 1336. The agents also implied that if the case went to trial, Defendant's husband might find out about her relationship with another man. These actions during the interrogation were exactly the type of conduct that the Ninth Circuit found to be "patently coercive" in Tingle. See Tingle, 658 F.2d at 1336.

The Government argues that the agents did not misrepresent the purpose of the interview and the tone of the interview was conversational. [Doc. No. 34 at 3.] Although the tone of the interview was conversational for the first three hours, once Agent Bettencourt entered the room,

---

[3] The Court recognizes that the recitation of the potential sentence a defendant might receive does not by itself render a statement involuntary. United States v. Bautista-Avila, 6 F.3d 1360, 1365 (9th Cir. 1993). However, warning that a lengthy prison sentence can be imposed is a factor the Court may consider in determining whether the confession was voluntary. See, e.g., Tingle, 658 F.2d at 1336.

[4] The Court recognizes, as the Ninth Circuit did in Tingle, that in certain circumstances, it is proper for an interrogating officer to represent to a suspect that her cooperation will be made known to the prosecutor. 658 F.2d at 1336 n.4. However, where the offer to inform the prosecutor of defendant's cooperation was one of a series of representations made to defendant, it is proper to consider the cumulative effect of those statements in determining whether the confession was voluntary. Id.; see also Williams v. Woodford, 384 F.3d 567, 595 (9th Cir. 2002) ("[A] promise of leniency accompanied by threats or other coercive practices constitutes improper influence and makes a subsequent inculpatory statement involuntary.").

[5] The Court notes that this statement was particularly misleading and deceptive.

the tone changed. Agent Bettencourt appeared to be agitated, was speaking very loudly, yelling at times, and was pacing around the room. Also, after Agent Bettencourt left and Officer Morales began conducting the interrogation, Officer Morales spoke very affirmatively with Defendant, constantly interrupting her and trying to put words in her mouth. Therefore, the tone of the interrogation was aggressive and confrontational rather than conversational when Agent Bettencourt and Officer Morales were involved.

Next, the Government argues that no promises or threats were made during the interview. [Doc. No. 34 at 3.] Although the agents did not expressly promise anything to Defendant, the agents told Defendant if she continued to lie, they would communicate that to the prosecutor and warned that the prosecutor would seek the maximum penalty. The agents also warned Defendant that if the case went to trial, her husband might find out about her relationship with another man.

At the hearing, the Government argued that although the agents made a couple improper statements, that the totality of the interrogation was not coercive because it was only a couple of statements over the course of a four-hour long interview. However, the Court finds that the agents made numerous improper statements rather than just a couple. In addition, although the entirety of the interview lasted almost four hours, the majority of the coercive statements were made during a 35-minute period when Agent Bettencourt and Officer Morales were involved in the interrogation. Accordingly, the Court finds that the agents' conduct was patently coercive.

However, the Court must not only find that the agents engaged in coercive conduct, the Court must also find that their coercive conduct caused Defendant to confess. See Brown, 644 F.3d at 979; Pollard v. Galaza, 290 F.3d 1030, 1033. The Government argues that the Defendant's will was not overborne by the agents' conduct because she remained calm throughout the interview and at the end of the interview, she told Agent MacKenzie that she did not feel pressured to say anything. [Id.] The Government argues that, therefore, the present case is distinguishable from Tingle, where the defendant was crying and shaking for several minutes when the agents obtained her confession. See Tingle, 658 F.3d at 1334.

The Court finds that after reviewing the totality of the circumstances surrounding the interrogation, the agents' coercive actions caused Defendant to confess. Although Defendant was

willing to speak with the agents and changed her story several times, Defendant maintained throughout the interrogation that she did not know there were drugs in her car. It was not until the agents engaged in all of the above coercive activity that Defendant finally admitted to knowing about the drugs. Further, even after she confessed, Defendant did not appear to be confident in her confession. The Defendant told Agent MacKenzie: "I think I'm admitting that I knew that they were going to put the drugs in the car." [Doc. No. 21-5 at 1.] Although Defendant did not cry and shake like the defendant in <u>Tingle</u>, Defendant did become noticeably upset when Officer Morales began interrogating her and made comments about her children. This is important because it was shortly after that when Defendant first admitted to having knowledge about the drugs.

In addition, the length of the interrogation weighs towards finding that Defendant's statements were involuntary. The Government argues that there is no case law that suggests a three-hour interrogation compels a finding of involuntariness. [Doc. No. 34 at 3-4.] In support of this argument, the Government cites a Ninth Circuit case affirming the denial of a habeas petition where the state court found that the defendant's statements were voluntary even though he was subjected to an eight hour interrogation. [<u>Id.</u> at 4 (citing <u>Clark</u>, 331 F.3d at 1072-73).] However, in <u>Tingle</u>, the Ninth Circuit found the interrogation to be coercive even though it only lasted for one hour. <u>See</u> <u>Tingle</u>, 658 F.3d at 1333. In addition, the Supreme Court and the Ninth Circuit have repeatedly stated that the length of the interview is a factor to be considered in determining whether the statements were voluntary. <u>See, e.g.,</u> <u>Brown</u>, 644 F.3d at 979; <u>Withrow</u>, 507 U.S. at 693. Four hours is a long time for an interrogation. In addition, it is important that much of the coercive conduct occurred towards the end of the interrogation after it had continued for over three hours.

Finally, the Court recognizes that Defendant later told Agent MacKenzie that she did not feel pressured into talking to the agents. However, the Court gives this statement little weight. When asking Defendant if her statements were voluntary, Agent MacKenzie made references to physical coercion, and Defendant stated that she confessed because the other agent made her realize a lot of stuff. Based on the Court's review of the record, it appears that Officer Morales most likely made Defendant "realize a lot of stuff" by making coercive statements to her.

1 Therefore, Defendant's statements to Agent MacKenzie actually support a finding that the agents' coercive actions caused Defendant's confession.

In sum, the Court finds that the agents' patently coercive conduct caused Defendant to admit that she knew the drugs were in her car and that she would be compensated for transporting the drugs. Therefore, these statements were involuntary.[6]  However, the Court also finds that Defendant's statements made prior to Agent Bettencourt entering the interrogation room and participating in the interrogation were voluntary and not caused by coercive conduct. Therefore, the Court only suppresses the statements made after Agent Bettencourt entered the interrogation room. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to suppress.

## II.     Defendant's Motion in Limine to Admit Exculpatory Statements

Defendant moves to admit the entirety of the statements she made during the interrogation. [Doc. No. 23-1 at 8-10.] Defendant argues that to the extent the Court does not suppress her statements, the Court should allow her to present the remainder of the statements made during the interrogation. [Id.] However, any such exculpatory statements constitute inadmissible hearsay. See United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000). Therefore, Defendant may not present these statements as part of her case-in-chief. Defendant may only use statements from the interrogation for impeachment purposes on cross-examination. See United States v. Bao, 189 F.3d 860, 866 (9th Cir. 1999) ("because a declarant's prior inconsistent statement is not offered for its truth, it is not hearsay."). Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion in limine to admit exculpatory statements.

///

///

---

[6] The Court recognizes that there were some factors that weigh towards finding that Defendant's statements were voluntary: (1) Defendant was 36 years old at the time of the interrogation; (2) there was no evidence Defendant had a diminished state of mine; (3) Defendant was not handcuffed during the interview; (4) the agents were dressed in plain clothes and did not have visible firearms; and (5) the interrogation took place in a basic 8 by 10 interrogation room rather than a holding cell. However, the Court finds that these factors are clearly outweighed by the numerous coercive statements made by the agents, the tone of the interrogation, the length of the interrogation, and Defendant's reaction to the agents' statements.

## CONCLUSION

For the reasons explained herein, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to suppress and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion in limine to admit exculpatory statements.

**IT IS SO ORDERED.**

**DATED:** June 15, 2012

**IRMA E. GONZALEZ**
**United States District Judge**